670 A.2d 1

NEW JERSEY TURNPIKE AUTHORITY, PETITIONER–APPEL-
LANT, v. NEW JERSEY TURNPIKE SUPERVISORS ASSO-
CIATION, RESPONDENT–RESPONDENT.

Argued September 26, 1995—Decided January 31, 1996.

186

*Michael K. Furey* argued the cause for appellant (*Riker, Danzig, Scherer, Hyland & Perretti*, attorneys; *Mr. Furey* and *James P. Anelli*, on the briefs).

*Steven A. Kunzman* argued the cause for respondent New Jersey Turnpike Supervisors Association (*Bivona Cohen*, attorneys; *John E. Coley, Jr., Judith A. Babinski*, and *Julienne S. Duncan*, on the brief).

*Robert E. Anderson,* General Counsel, argued the cause for respondent New Jersey Public Employment Relations Commission.

The opinion of the Court was delivered by

HANDLER, J.

In this case, disciplinary action was taken against a supervisory employee based on a claim that he had sexually harassed a subordinate employee. Both individuals worked for the New Jersey Turnpike Authority, a governmental agency. The supervisor was a member of an employee union, which had entered into a collective negotiations agreement that provided disciplinary procedures, including the binding arbitration of grievances.

After the imposition of discipline, the supervisor filed a grievance, claiming that the Authority failed to follow disciplinary procedures required by the agreement. The Authority refused to hear the grievance or submit it to arbitration, contending that because the discipline was based on a claim of sexual harassment, the appropriate procedures for determining the discipline were governed by the Law Against Discrimination and, therefore, were beyond the scope of collective negotiations and were unenforceable.

That contention is the central issue on this appeal. A related issue is whether the imposition of employee discipline based on sexual harassment in the workplace implicates matters of managerial prerogative and, therefore, disciplinary procedures established through collective negotiations, including binding arbitration, cannot be applied in such a case.

I

The New Jersey Turnpike Authority ("Turnpike Authority" or "Authority"), a public administrative agency of the State of New Jersey, *N.J.S.A.* 27:23–1 to –40, is a public employer within the meaning of the "New Jersey Employer–Employee Relations Act."

*N.J.S.A.* 34:13A–3(c) ("Act"). The Authority entered into a Collective Negotiations Agreement ("CNA") with the New Jersey Turnpike Supervisors Association ("Supervisors Association"), an organized labor representative within the meaning of the Act, *N.J.S.A.* 34:13A–3(d), and the collective negotiations representative for the toll supervisors employed by the Authority. The CNA, covering the term from July 1991 through June 1994, provides binding arbitration for minor disciplinary determinations, including suspensions not exceeding five days.

On January 15, 1992, the Authority received notice of a claim filed by one of its female toll collectors ("claimant") alleging that her immediate supervisor, Patrick Gabriele ("supervisor"), sexually harassed her. The supervisor was employed by the Authority as a Toll Plaza Supervisor and was a member of the Supervisors Association. According to the claimant, on January 11, 1992, she misplaced a pass that the Authority's work rules required her to have in her possession. The claimant informed the supervisor that she misplaced her pass. The claimant and the supervisor then searched for the pass in the claimant's toll booth. In the course of the search, the claimant went down on her hands and knees to look on the floor. While the claimant was in that position, the supervisor allegedly exclaimed, "Hey, look she's on her hands and knees to me," and at the same time, he allegedly gyrated his hips mimicking a sexual motion. Unbeknownst to the supervisor, he was seen by another toll collector working in an adjacent toll booth. When the supervisor realized that his actions were being observed, he allegedly stated, "You have to have a sense of humor on the Turnpike to survive."

The toll collector who witnessed the supervisor's behavior informed the claimant what she had seen. The claimant allegedly became traumatized to the extent that she later vomited and suffered from severe muscle spasms.

The claimant filed a sexual harassment complaint against the supervisor in accordance with the Turnpike Authority's Sexual Harassment Policy. Pursuant to that policy, the Authority con-

ducted an internal investigation of the incident. When the investigation concluded, the Authority notified the supervisor and the Supervisors Association that a committee would convene a special sexual harassment hearing.

At that hearing, all witnesses to the incident were permitted to give a statement about what they observed. The Authority permitted the supervisor, the supervisor's attorney and his union representative from the Supervisors Association to attend the hearing. Although the supervisor and the Supervisors Association were permitted to present factual witnesses on their behalf, they were not permitted to present any character witnesses on behalf of the supervisor and the supervisor's legal counsel was not permitted to cross-examine any of the factual witnesses.

The Authority's sexual harassment committee concluded that the supervisor had in fact committed an act of sexual harassment in violation of the Authority's policies, work rules, and procedures. Pursuant to Article XV of the CNA, the committee recommended a three-day suspension without pay. The supervisor was informed that he could appeal the recommended discipline to the Commissioners of the Authority. The supervisor appealed and the Commissioners upheld the three-day suspension.

The Supervisors Association filed a grievance on behalf of the supervisor against the Turnpike Authority, alleging that the Authority violated the disciplinary procedures of Article XV of the CNA. Specifically, the Supervisors Association complained that the Authority did not permit the supervisor's attorney to call character witnesses or cross-examine the factual witnesses.

The Authority issued the following response to grievance:

This is an inadequate statement of grievance. However, if this refers to the sexual harassment complaint, this matter is pre-empted by federal and state statutes and is not grievable. There is no violation of the Supervisors–Association contract.

Following a request for arbitration by the Supervisors Association, the Authority submitted a Scope of Negotiation claim to the Public Employment Relations Commission ("PERC"), claiming that the grievance was pre-empted by the New Jersey Law Against Dis-

crimination, *N.J.S.A.* 10:5–1 to –42 ("LAD"), and Executive Order No. 88, which require state employers to adopt policies to eradicate sexual harassment from the workplace. PERC, however, appointed an arbitrator and denied the Turnpike Authority's request that the arbitration be restrained as non-arbitrable.

The issue of arbitrability was simultaneously considered by PERC and the arbitrator. PERC sustained the grievance, as did the arbitrator shortly thereafter. Both the Commission and the arbitrator determined that the disciplinary procedures applicable to charges of sexual harassment were negotiable and that the grievance relating to those procedures was arbitrable under the collective negotiations agreement.

The Turnpike Authority then appealed PERC's decision to the Appellate Division, which affirmed the determination that the disciplinary procedures involving a claim of sexual harassment were within the scope of collective negotiations and that the grievance relating to those procedures was subject to binding arbitration under the collective negotiations agreement. 276 *N.J.Super.* 329, 647 *A.*2d 1369 (1994). This Court granted the Turnpike Authority's petition for certification. 139 *N.J.* 441, 655 *A.*2d 444 (1995).

II

The major issue is whether procedures, including binding arbitration, determining minor discipline for sexual harassment complaints in the workplace are within the scope of collective negotiations. Resolving that issue depends on the legislative treatment of the subject, and, more specifically, on whether the negotiation of disciplinary procedures relating to sexual harassment complaints is authorized or prohibited by statute.

The first part of that inquiry must be directed to the statutory treatment of disciplinary procedures generally as a permissible subject of collective negotiations. The answer is found in the plain language of the Public Employer–Employee

Relations Act, which clearly requires negotiation over disciplinary disputes and disciplinary review procedures. The language further specifies that disciplinary review procedures may provide binding arbitration as a means of resolving disputes. *N.J.S.A.* 34:13A–5.3 states:

> [T]he public employer shall meet at reasonable times and negotiate in good faith with respect to grievances, *disciplinary disputes,* and other terms and conditions of employment.

> \*    \*    \*    \*    \*    \*    \*    \*

> Public employers shall negotiate written policies setting forth grievance and *disciplinary review procedures* by means of which their employees or representatives of employees may appeal the interpretation, application or violation of polices, agreements, and administrative decisions, *including disciplinary determinations,* affecting them, provided that such grievance and disciplinary review procedures shall be included in any agreement entered into between the public employer and the representative organization. *Such grievance and disciplinary review procedures may provide for binding arbitration as a means for resolving disputes....* *Grievance and disciplinary review procedures established by agreement between the public employer and the representative organization shall be utilized for any dispute covered by the terms of such agreement.* (emphasis added).

The legislative history of this provision of the statute ratifies the unmistakable import of its plain language. Before 1982, the relevant section of *N.J.S.A.* 34:13A–5.3 merely stated that "the public employer shall meet at reasonable times and negotiate in good faith with respect to grievances and terms and conditions of employment." Construing that section, the Appellate Division determined that no aspect of the disciplinary process between public employers and employees was negotiable. *State v. Local 195 IFPTE,* 179 *N.J.Super.* 146, 153, 430 *A.2d* 966 (1981) (stating "public employers cannot effectively and efficiently perform their governmental functions and fulfill their obligations to the public if they do not have the power to discipline employees without the encumbrances of collective negotiations and binding arbitration"), *certif. denied,* 89 *N.J.* 433, 446 *A.2d* 158 (1982); *Jersey City v. Jersey City Police Officers' Benevolent Ass'n,* 179 *N.J.Super.* 137, 430 *A.2d* 961 (App.Div.1981) (same), *certif. denied,* 89 *N.J.* 433, 446 *A.2d* 158 (1982).

The Legislature specifically amended the statute to countermand the result reached by *Local 195 IFPTE*. A statement on February 1, 1982, by the sponsors of the amendment to *N.J.S.A.* 34:13A–5.3 confirms that express purpose.

> In June of 1981 the Appellate Division ... ruled that disciplinary determinations did not fall within the scope of mandatory negotiations and that collective agreements could not, therefore, provide for the submission to binding arbitration of contested disciplinary actions.
>
> This bill would overturn [*Local 195 IFPTE* ] so as to give meaning to the State Constitution's guarantee of the right of public employees to "present ... their grievances and proposals through representatives of their own choosing." The proposed legislation merely provides that administrative decisions affecting public employees—already clearly recognized by the court as negotiable—will be understood to encompass "disciplinary determinations" and *that disciplinary review procedures as well as disciplinary disputes in general, will be a required subject of negotiations as a term and condition of employment.* Disciplinary actions have an unquestionably intimate and direct effect on the work and welfare of public employees and should be viewed as only indirectly related to the right of public officials to determine substantive governmental or educational policy. *The above amendments also empower public employers to negotiate binding arbitration procedures for disciplinary disputes. Under this bill, contractual provisions concerning disciplinary disputes could cover such basic issues as a review of the guilt or innocence of an employee with respect to both major and minor disciplinary infractions, and the standards for, and reasonableness of, any penalty imposed.*
>
> The proposed legislation does not challenge the exclusive power of the employer to initiate discipline or discharge a public employee for misconduct, incompetency or inefficiency so as to maintain an adequate and effective work force. *It merely assures organized public employees that procedures to review such important considerations as the fairness of disciplinary actions can be available to them through negotiations, and may be examined by an independent third party, if the parties so agree in their contract.*
>
> [*Assembly, No. 706,* Statement Appended to Bill Amending P.L.1968, c. 303 (Feb. 1, 1982) (emphasis added) (citation omitted).]

We conclude that *N.J.S.A.* 34:13A–5.3 clearly provides, consistent with the expressed intention of the Legislature, that disciplinary procedures shall be subject to collective negotiations and that those procedures may include binding arbitration. *See County College of Morris Staff Ass'n v. County College of Morris,* 100 *N.J.* 383, 397, 495 *A.2d* 865 (1985) (recognizing that a public employer may contractually agree to abide by principles of proce-

dural fairness, which include deferral to binding arbitration, when determining an accused employee's guilt or innocence).

Article XV of the CNA, entitled "Disciplinary Action," comports with the statutory authority for collective negotiation and agreement over disciplinary review procedures, including grievances and binding arbitration, specifically, in respect of disputes involving minor discipline. The agreement provides:

> In the exercise of Minor Discipline, the employee who is alleged to be guilty of violations of rules, regulations, or procedures shall be served with a formal notice and specification of the alleged violation, which shall hereafter be referred to as "Advisory Notice of Disciplinary Action."
>
> \*　\*　\*　\*　\*　\*　\*　\*
>
> As a respondent, the Employee involved shall be entitled to request in his defense such witnesses as he may wish to have present; the right of cross-examination of all witnesses and the right to have made available to him such records, files, and documents as he may consider necessary to his defense.
>
> \*　\*　\*　\*　\*　\*　\*　\*
>
> In the event the decision of the Executive Director is unsatisfactory, the Association may submit the matter to binding arbitration pursuant to the rules of the Public Employment Relations Commission. . . .

Thus, under *N.J.S.A.* 34:13A–5.3 and Article XV of the CNA, binding arbitration has been authorized to resolve the current dispute over the disciplinary procedures that are applicable for imposing minor discipline, which under the CNA includes suspensions for up to five days.

The Turnpike Authority contends, further, that the otherwise clear provisions of the New Jersey Employer–Employee Relations Act and its collectively negotiated contract authorizing binding arbitration of disciplinary grievances cannot be applied in a case in which discipline is imposed for sexual harassment because that subject has been preempted by the LAD. Therefore, it concludes that the contractual disciplinary procedures, as applied to disciplinary disputes involving sexual harassment, are prohibited and non-negotiable.

■ The Act itself expressly addresses whether disciplinary procedures that are authorized as a permissible subject of collective negotiation, including binding arbitration, may be deemed

unenforceable. The Act, *N.J.S.A.* 34:13A–5.3, specifically provides:

The procedures [relating to grievances and disciplinary review] agreed to by the parties may not replace or be inconsistent with any alternate statutory appeal procedure nor may they provide for binding arbitration of disputes involving discipline of employees with statutory protection under tenure or civil service laws.

Thus, under the Act an employer may agree to submit a disciplinary dispute to binding arbitration pursuant to the negotiated disciplinary procedures, provided those procedures neither replace nor are inconsistent with any other statutory remedy. If an aggrieved employee has an alternative statutory remedy against alleged unjust discipline, then binding arbitration of that grievance, otherwise authorized as part of negotiated disciplinary procedures, may not be invoked. *See State v. State Troopers Fraternal Ass'n,* 134 *N.J.* 393, 411–12, 634 *A.2d* 478 (1993) (recognizing that *N.J.S.A.* 34:13A–5.3 expressly prohibits binding arbitration of disputes involving the discipline of employees with statutory protection under tenure or civil service laws). Thus, the issue raised by this section of the Act is whether an alternative statutory appeal remedy is available to challenge the imposition of discipline based on an accusation of sexual harassment.

In addressing this issue, the Appellate Division determined that the imposition of discipline based on workplace sexual harassment is not subject to other statutory remedies. It stated: "it is undisputed that the toll supervisor has no appeal rights under LAD or any other statute respecting the minor discipline. Consequently, the discipline amendment [*N.J.S.A.* 34:13A–5.3] controls this case." 276 *N.J.Super.* at 335, 647 *A.2d* 1369. We concur in that conclusion. It is clear that under *N.J.S.A.* 34:13A–5.3 the specific and narrow statutory exemption of disciplinary procedures from collective negotiation is not applicable to disciplinary procedures invoked in a case based on sexual harassment.

The Turnpike Authority also argues that the provisions of the Act authorizing the negotiation of disciplinary procedures, including binding arbitration, are unenforceable because the LAD imposes affirmative obligations that are inconsistent with those procedures as applied to sexual harassment complaints.

The LAD specifically prohibits employment discrimination based on sex. *N.J.S.A.* 10:5–12. Although the legislative history of the LAD is silent on the subject of sexual harassment, our Court has recognized that sexual harassment is a form of sex discrimination that violates the LAD. *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 601, 626 *A.*2d 445 (1993); *see Meritor Sav. Bank, FSB v. Vinson*, 477 *U.S.* 57, 106 *S.Ct.* 2399, 91 *L.Ed.*2d 49 (1986). Further, a "hostile work environment" claim is a specific category of sexual harassment. *See Erickson v. Marsh & McLennan Co.*, 117 *N.J.* 539, 555–56, 569 *A.*2d 793 (1990) (suggesting that sexual harassment that creates a hostile environment is prohibited under LAD). Actionable workplace sexual harassment "occurs when an employer or fellow employees harasses an employee because of his or her sex to the point at which the working environment becomes hostile." *Lehmann, supra,* 132 *N.J.* at 601, 626 *A.*2d 445.

The Authority asserts that resort to negotiated disciplinary procedures for resolving disciplinary disputes based on sexual harassment is incompatible with the statutory protections against sexual harassment under the LAD. The affirmative obligations effectuating those protections, the Authority points out, are imposed by the test formulated by the Court in *Lehmann* for establishing a cause of action for "hostile work environment" sexual harassment. *Id.* at 619–21, 626 *A.*2d 445. An employer may be subject to vicarious liability for a supervisor's conduct on the basis of agency law or negligence principles. *Ibid.* Liability may arise if "an employer was negligent by its failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms." *Id.* at 621, 626 *A.*2d 445. The Turnpike Authority also cites Executive Order No. 88 issued by former Governor Florio on April 4, 1993, as additional support for the imposition of such an affirmative obligation.[1] The Authority

---

[1] Executive Order No. 88 provides:

stresses that under the LAD, as construed by *Lehmann,* and the Executive Order, it is under an affirmative obligation to adopt clear and specific policies that govern sexual harassment complaints, and that it has in fact done so by adopting its Sexual Harassment Policy, which it was required to follow in this case.

The Appellate Division determined that disciplinary procedures, including binding arbitration, would not interfere with a public employer's affirmative obligations to prevent and counteract sexual harassment. 276 *N.J.Super.* at 335, 647 *A.*2d at 1372. The court reasoned that "[b]oth the LAD and Executive Order No. 88 protect *victims* of sexual harassment." 276 *N.J.Super.* at 335, 647 *A.*2d at 1372. In contrast, "Article XV of the CNA sets up procedures by which *the person charged with harassment* may challenge his or her disciplinary penalty. To be sure, the two mechanisms address different subjects altogether." *Ibid.*

We agree with the Appellate Division that an employer's obligation to adopt and implement policies against sexual harassment "is distinct from the employees' ability to seek review of disciplinary actions based on allegations of sexual harassment." 276 *N.J.Super.* at 335, 647 *A.*2d at 1372. The LAD, Executive Order No. 88, and *Lehmann, supra,* impose a duty on public employers

---

WHEREAS, sexual harassment of any kind is totally repugnant to basic principles of equality; and

\* \* \* \* \* \* \* \*

WHEREAS, this State must take every necessary and appropriate step toward eradicating sexual harassment and gender discrimination from the workplace; and

\* \* \* \* \* \* \* \*

WHEREAS, the State should ensure that all governmental entities adopt effective policies to eradicate sexual harassment from the workplace;

NOW, THEREFORE, I, JIM FLORIO, Governor of the State of New Jersey ... do hereby ORDER and DIRECT:

\* \* \* \* \* \* \* \*

3. [A]ll State agencies, departments, authorities, and instrumentalities shall develop a plan for providing anti-sexual harassment training programs or seminars for employees and/or for management and administrative personnel....

to enact and enforce policies and procedures to eliminate sexual-harassment discrimination in the workplace. That duty is not undermined by a collectively negotiated agreement requiring fair disciplinary procedures and permitting neutral review when an employee is accused of sexual harassment. Moreover, the essence of that duty is to enforce the substantive standards that define sexual harassment and to prevent its occurrence at the workplace. *See* discussion, *infra,* 199–200, 670 *A.*2d at 8–9.

The Authority suggests, further, a more subtle but significant form of incompatibility between the respective statutory purposes to be served by collective negotiations of disciplinary matters and by the laws and policies against discrimination. An arbitrator, the Authority asserts, may be more inclined to find no sexual harassment than the Division on Civil Rights or a court under the LAD.

The Authority misperceives the duties of an arbitrator engaged in public sector arbitration and, thus, exaggerates the potential for inconsistent resolutions of workplace sexual harassment disputes. In the public sector, the public interest, welfare, and other pertinent statutory criteria are inherent in the standards that inform and govern public sector arbitration. *Kearny PBA Local No. 21 v. Town of Kearny,* 81 *N.J.* 208, 217, 405 *A.*2d 393 (1979). "In the public sector, unlike the private sector, public policy demands that the arbitrator follow the law and consider the public's interest and welfare." *Jersey City Educ. Ass'n v. Board of Educ.,* 218 *N.J.Super.* 177, 188, 527 *A.*2d 84 (App.Div.1987); *see Local 207 v. Borough of Hillsdale,* 263 *N.J.Super.* 163, 184, 622 *A.*2d 872 (App.Div.1993), *aff'd in part, rev'd in part,* 137 *N.J.* 71, 644 *A.*2d 564 (1994). We have determined that

> although parties in the private sector may explicitly authorize the arbitrator to decide legal issues ... irrespective of the governing law, this freedom is not available in the public sector. The parties in a public employment case cannot clothe the arbitrator with unbridled discretion, "for public policy demands that inherent in the arbitrator's guidelines are the public interest, welfare and other pertinent statutory criteria."
>
> [*CWA, Local 1087 v. Monmouth County Bd. of Social Servs.,* 96 *N.J.* 442, 450–51, 476 *A.*2d 777 (1984) (citation omitted).]

The public policy relating to workplace sexual harassment is both clear and powerful. The LAD, first enacted in 1945, enunciates a strong public mandate; its purpose is "nothing less than the eradication 'of the cancer of discrimination.'" *Lehmann, supra,* 132 *N.J.* at 601, 626 *A.*2d 445 (citation omitted); *see N.J.S.A.* 10:5–3 (The "Legislature finds and declares that practices of discrimination against any [New Jersey] inhabitants ... are a matter of concern to the government of the State...."). The LAD was enacted to protect not only the civil rights of aggrieved employees but also to protect the public's strong interest in a discrimination-free workplace. *Lehmann, supra,* 132 *N.J.* at 600, 626 *A.*2d 445. That public policy infuses the standards governing public sector arbitration of disputes arising from accusations of discrimination in the form of sexual harassment. *See Jersey City, supra,* 218 *N.J.Super.* at 194, 527 *A.*2d 84 (vacating part of award that was inconsistent with LAD); *see also County College of Morris Staff Ass'n, supra,* 100 *N.J.* at 391, 495 *A.*2d 865 (stating that "arbitrator's award is subject to being vacated when it has been shown that a statutory basis justifies such an action").

The CNA also requires an arbitrator to find reasonable cause for discipline if an employee violated the employer's rules and regulations. Those rules and regulations would presumably encompass the policies adopted by the employer to deal with workplace sexual harassment in accordance with the dictates of the LAD, Executive Order No. 88, and *Lehmann.* As noted, the Turnpike Authority has adopted a strict Sexual Harassment Policy, and the Authority's determination of the existence of sexual harassment as a basis for discipline in this case was pursuant to the procedures of its Sexual Harassment Policy. More importantly, however, that decision was, presumably, also based on the substantive standards expressed in the LAD, the Executive Order, and *Lehmann,* which the Sexual Harassment Policy is required to effectuate. Thus, as long as those substantive standards defining sexual harassment are applied, we find no fundamental inconsistency between the employer's Sexual Harassment Policy and the negotiated disciplinary procedures invoked to determine whether

sexual misconduct occurred and the appropriate discipline. Even though the procedures called for by the Policy are different from those called for by the CNA, the substantive standard that defines sexual harassment, which is incorporated as part of the Authority's Sexual Harassment Policy, must still be applied. We acknowledge the principle that an arbitral award may not disregard or question the employer's rules and regulations. *See Monmouth County Bd. of Social Servs., supra,* 96 *N.J.* at 448, 476 *A.*2d 777 (arbitrator cannot second-guess the employer's sexual harassment policy; "jurisdiction and authority of the arbitrator are circumscribed by and limited to the powers delegated to him."); *Division 540, ATU, AFL–CIO v. Mercer County Improvement Auth.,* 76 *N.J.* 245, 252–54, 386 *A.*2d 1290 (1978) (arbitrator is confined by the parties' contract and the inherent duty to consider the public interest and welfare); *cf. Local 462 v. Charles Schaefer & Sons,* 223 *N.J.Super.* 520, 528, 539 *A.*2d 295 (App.Div.1988) (decision vacated when arbitrator exceeded his authority by imposing a progressive disciplinary scheme where the contract did not so provide). That principle, however, is not violated as long as the employer's substantive policy against sexual harassment, which must reflect the standards of the LAD, is applied.

The Authority also cites other forms of potential inconsistency between the resolution of employment-disciplinary disputes through binding arbitration and the resolution of discrimination claims under the LAD by judicial and administrative determinations. It cites *Alexander v. Gardner–Denver Co.,* 415 *U.S.* 36, 94 *S.Ct.* 1011, 39 *L.Ed.*2d 147 (1974).

The United States Supreme Court in *Alexander* held that submission to binding arbitration of an employee's claim of racial discrimination in his discharge does not foreclose the employee's right to file suit under Title VII in federal district court. The Supreme Court stated: "[a] contractual right to submit a claim to arbitration is not displaced simply because Congress also has provided a statutory right against discrimination. Both rights have legally independent origins and are equally available to the

aggrieved employee." *Alexander, supra,* 415 *U.S.* at 52, 94 *S.Ct.* at 1022, 39 *L.Ed.*2d at 160.

*Alexander* thus recognized the availability of alternative remedies for an employee who is the victim of discrimination, and inferentially, it recognized the possibility of inconsistent results. However, in this case, the aggrieved employee is not the victim of discrimination. *See* discussion, *supra,* at 197, 670 *A.*2d at 7. Moreover, when interpreting the CNA, the arbitrator here must consider the LAD, employee welfare, and the strong public policy in favor of eradicating discrimination. Hence, the possibility of inconsistent results in arbitration proceedings and separate administrative or judicial actions under the LAD is sharply reduced.[2]

We conclude that the negotiated disciplinary procedures were applicable in this case. Our laws that call for powerful protection and strict policies against discrimination by sexual harassment do not statutorily preempt or supersede the statutory authority of public employees and their representatives to negotiate disciplinary procedures, including binding arbitration, for imposing minor discipline based on workplace sexual harassment charges.

### III

The Turnpike Authority raises a related argument that disciplinary procedures authorizing binding arbitration applicable to sexual harassment complaints implicate inherent managerial prerogatives and, therefore, are non-negotiable and unenforceable. The Authority, in this argument, relies on the separate provision of *N.J.S.A.* 34:13A–5.3 that "public employers shall ... negotiate

---

[2] The Authority also now raises an argument somewhat related to the position it urges on the basis of the *Alexander* decision. The Authority contends that, given the possibility of inconsistent results from arbitration and actions under the LAD, this case implicates concerns of administrative comity, citing *e.g., City of Hackensack v. Winner,* 82 *N.J.* 1, 410 *A.*2d 1146 (1980), and *Hinfey v. Matawan Regional Bd. of Educ.,* 77 *N.J.* 514, 391 *A.*2d 899 (1978). That issue, however, was never raised or considered by the lower courts and, hence, is not appropriately presented on this appeal. We, therefore, decline to address it.

in good faith with respect to grievances, disciplinary disputes, and other *terms and conditions of employment*" (emphasis added), and on the judicial interpretation that matters of managerial prerogative are not negotiable "terms and conditions of employment." *E.g., In re Local 195 IFPTE v. State*, 88 *N.J.* 393, 443 *A.2d* 187 (1982). Implicit in that argument is the assumption that the portion of *N.J.S.A.* 34:13A–5.3 that now specifically authorizes public employers through collective negotiation to submit "grievances" and "disciplinary disputes" to binding arbitration does not override the judicial exclusion of matters of managerial prerogative from otherwise negotiable terms and conditions of employment.

There are two responses to that argument. First, "terms and conditions of employment" subject to negotiation refer only to those terms and conditions of employment that the Legislature has not otherwise addressed and determined. *E.g., Dunellen Bd. of Educ. v. Dunellen Educ. Ass'n*, 64 *N.J.* 17, 31, 311 *A.2d* 737 (1973). The Legislature, however, has unmistakably addressed "disciplinary procedures" in the context of terms and conditions of employment, and has clearly determined that they are negotiable. *See* discussion, *supra*, at 192–194, 670 *A.2d* at 4–5.

Second, disciplinary procedures, including binding arbitration, governing the imposition of minor discipline, do not implicate matters of inherent managerial prerogatives and, therefore, constitute terms and conditions of employment that are negotiable.

In *In re Local 195 IFPTE, supra*, 88 *N.J.* 393, 443 *A.2d* 187, this Court established a three-part test for determining what "terms and conditions of public employment" are negotiable. First, "a subject is negotiable only if it 'intimately and directly affect[s] the work and welfare of public employees.'" *Id.* at 403, 443 *A.2d* 187 (citation omitted). The parties do not dispute that affording employees with impartial review of disciplinary disputes affects the work and welfare of public employees. *See Assembly, No. 706*, Statement, *supra* ("Disciplinary actions have an unquestionably intimate and direct effect on the work and welfare of

public employees."); *Bethlehem Township Bd. of Educ. v. Bethlehem Township Educ. Ass'n,* 91 *N.J.* 38, 44, 449 *A.*2d 1254 (1982).

Second, a subject is negotiable if it has not been preempted by statute or regulation. *In re Local 195 IFPTE, supra,* 88 *N.J.* at 403, 443 *A.*2d 187. However, "[n]egotiation is preempted only if the "statutory or regulatory provisions ... speak in the imperative and leave nothing to the discretion of the public employer." *Id.* at 403–04, 443 *A.*2d 187 (quoting *State v. State Supervisory Employees Ass'n,* 78 *N.J.* 54, 80, 393 *A.*2d 233 (1978)). *See Bethlehem Township Bd. of Educ., supra,* 91 *N.J.* at 44, 449 *A.*2d 1254. Nothing in the LAD speaks in such an imperative. The employer retains its discretion to negotiate the disciplinary procedures providing neutral review of a disciplinary sanction. Moreover, nothing in the LAD compels an accused employee to forego an arbitral forum contesting discipline that may be unfounded or unjust. *See* discussion, *supra,* at 196–199, 670 *A.*2d at 6–8.

In respect of the third prong of the *IFPTE* test, a topic affecting the work and welfare of public employees is negotiable only if it is a matter "on which negotiated agreement would not significantly interfere with the exercise of inherent management prerogatives pertaining to the determination of governmental policy." *In re Local 195 IFPTE, supra,* 88 *N.J.* at 404, 443 *A.*2d 187 (citations omitted); *see Kearny PBA Local No. 21, supra,* 81 *N.J.* at 215, 405 *A.*2d 393 (stating that "prerogatives of management, particularly those involving governmental policy making, cannot be bargained away to be determined by an arbitrator."). The application of disciplinary procedures for minor disciplines will not significantly interfere with the governmental policy of eradicating sexual harassment from the workplace and enforcing those policies. *See Bethlehem Township Bd. of Educ., supra,* 91 *N.J.* at 44, 449 *A.*2d 1254.

■ Although the conduct giving rise to the dispute over discipline involves sexual harassment discrimination, this case does not involve any issue implicating the employer's basic managerial

authority over personnel. *E.g., Teaneck Bd. of Educ. v. Teaneck Teachers Ass'n,* 185 *N.J.Super.* 269, 448 *A.*2d 487 (App.Div.1982), *aff'd,* 94 *N.J.* 9, 14–15, 16, 469 *A.*2d 137 (1983) (observing that "[a] public employer cannot bargain away the review of a decision whether to hire, promote, or retain teaching staff;" and, further, observing that the fact "[t]hat the State's Law Against Discrimination sets statutory terms and conditions of employment does not resolve the issue whether *application* of those terms of employment to an employee is arbitrable." (emphasis added)); *Jersey City Educ. Assoc. v. Board of Educ.,* 218 *N.J.Super.* 177, 187–88, 527 *A.*2d 84 (App.Div.1987) (concluding that apart from claim of racial discrimination, subject of promotions was not negotiable and, therefore, not arbitrable because it implicated a government employer's managerial prerogative regarding personnel decisions).

The Authority also cites *Ridgefield Park Education Association v. Ridgefield Park Board of Education,* 78 *N.J.* 144, 156, 393 *A.*2d 278 (1978), in support of the argument that subjecting the enforcement of anti-discrimination policy to private arbitration, in effect, allows an arbitrator to rule on, and therefore set, LAD policy, and, therefore, is an impermissible "delegation" of government responsibility to the private sector.

As previously demonstrated, nothing in the LAD specifically prohibits public employers and employees from negotiating procedures for disciplinary disputes arising from allegations of discrimination. The LAD does not require that an employee accused of sexual harassment be denied a negotiated right to fair disciplinary procedures and neutral review. *See Assembly, No. 706,* Statement, *supra* (noting that *N.J.S.A.* 34:13A–5.3 "empower[s] public employers to negotiate binding arbitration procedures for disciplinary disputes [which could] cover such basic issues as a review of the guilt or innocence of an employee with respect to both major and minor disciplinary infractions, and the standards for, and reasonableness of, any penalty imposed."); *Division 540, ATU v. Mercer County Improvement Auth., supra,* 76 *N.J.* at 250–52, 386 *A.*2d 1290 (recognizing that binding arbitration may be an

appropriate forum for labor disputes involving public employers). The Legislature itself understood that allowing employees to negotiate over disciplinary disputes arising from allegations of discriminatory conduct and subjecting those disputes to binding arbitration need not "significantly interfere" with a public employer's "managerial prerogative" to develop and implement anti-discrimination policies or punish employees for violating such policies. *See, e.g., Assembly, No. 706,* Statement, *supra* (recognizing that disciplinary actions will be subject to negotiations and "should be viewed as only indirectly related to the right of public officials to determine substantive governmental or educational policy."). Moreover, an arbitrator in the public sector in disciplinary matters is enjoined to effectuate and advance the strong public policy against discrimination in cases arising from complaints of sexual harassment.

We conclude that the negotiation of disciplinary procedures, including binding arbitration, for the imposition of discipline based on claims of sexual harassment is specifically authorized as a negotiable subject and does not impinge on or implicate an inherent managerial prerogative.

## IV

For the reasons set forth in this opinion, we affirm the judgment of the Appellate Division.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, O'HERN, GARIBALDI and STEIN—5.

*Opposed*—None.